IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

WALTER OLEJNIK, KATHERINE OLEJNIK,
KENNETH OLEJNIK, and JOANN OLEJNIK,

OPINION & ORDER

Plaintiffs,

v.                                                                    14-cv-88-jdp

TRACI J. ENGLAND and ONEIDA COUNTY,

Defendants,

and

WISCONSIN COUNTY MUTUAL
INSURANCE CORPORATION,

Intervenor Defendant.

Defendant Traci J. England used to be the medical examiner for Oneida County. Her primary duty as medical examiner was to investigate and determine the causes of deaths in the county. But England also had a sideline, separate from her work for the county: she was training her personal dog to locate cadavers, and to do this she needed human specimens. So she took specimens from three autopsies performed for the county. She did so without the knowledge or consent of the decedents' families, which led to criminal charges, her resignation as medical examiner, and, ultimately, this lawsuit.

Plaintiffs here are close relatives of David Olejnik, one of the decedents from whom England took specimens for dog-training purposes. Plaintiffs allege that England improperly ordered Olejnik's autopsy in the first place, and that she then improperly took parts of his body for personal use. They bring federal claims under the auspices of 42 U.S.C. § 1983, contending that England violated their rights to procedural and substantive due process, and

they bring state law claims against her for conversion and for negligent infliction of emotional distress. Plaintiffs also seek indemnification for England's wrongdoing from Oneida County. The county's insurer, Wisconsin County Mutual Insurance Corporation (WCMIC), has intervened and seeks a declaration that none of plaintiffs' claims would be covered under the county's policy. All defendants have moved for summary judgment, and these motions are now before the court.

Plaintiffs' indignation at England's disrespectful conduct is understandable. But the question here is whether England's actions violated plaintiffs' rights under the U.S. Constitution. The Constitution protects citizens from government abuse of their rights, and section 1983 provides a vehicle for those who have suffered such abuse to recover damages. But neither the Constitution nor section 1983 automatically provides a remedy for every wrong committed by a government employee.

The court concludes that England's decision to order the Olejnik autopsy was justified under Wisconsin law because she subjectively concluded that his death was unexplained, and thus the autopsy itself did not violate any of plaintiffs' rights. England's taking of Olejnik's bodily specimens was wrongful, but it was an individual action not taken "under color of law," and thus it is not actionable under section 1983. Moreover, England's actions, although upsetting and illegal, did not violate plaintiffs' procedural or substantive due process rights under the Constitution. Whatever recourse plaintiffs have for England's actions is exclusively a matter of Wisconsin law.

The court will grant defendants' motions for summary judgment and dismiss plaintiffs' federal claims. Because the initial basis for federal jurisdiction is gone, the court

will remand plaintiffs' state law claims to state court. WCMIC's motion for summary judgment on coverage will be denied as moot; that issue may be presented to the state court.

## UNDISPUTED FACTS

Except where noted, the following facts are undisputed.

Traci J. England was Oneida County Medical Examiner from 2007 through January 17, 2012. As medical examiner, she had one essential job duty: to determine the cause and manner of deaths in the county. England had some specialized training, but she was not a physician or a pathologist, so she could not herself perform autopsies. She could, however, order autopsies when needed. Wisconsin law mandates autopsies under certain circumstances, as in the case of the death of an inmate. But commonly, ordering an autopsy is a matter of discretion. As medical examiner, England had the authority to order an autopsy whenever, in her subjective opinion, a death involved unexplained, unusual or suspicious circumstances. Wis. Stat. §§ 979.01, .02, .04.

At some point during her term as medical examiner, England decided to train her own dog to locate human remains. The task of locating human remains is not part of the duties of the medical examiner; neither is owning or training a cadaver dog. England did not intend to use her dog in connection with her job as medical examiner.

David Olejnik died on May 16, 2011, at the age of 38. The next day, England authorized his autopsy. Pursuant to an inter-county agreement, the autopsy was performed in Fond du Lac County by its chief medical examiner and forensic pathologist, P. Douglas Kelley, MD. Olejnik was obese and in ill health; he had been hospitalized with difficulty breathing. England believed that the autopsy was appropriate because Olejnik was a relatively

3

young man who died suddenly, and thus his death involved unexplained circumstances. At the time, David's parents, plaintiffs Walter and Katherine Olejnik, accepted that the autopsy was necessary "because we didn't know what caused his death." Dkt. 95, at 17.

England transported Olejnik's body to Fond du Lac County for autopsy on May 18, 2011. England was present during a portion of the autopsy. England admits that she took a piece of gauze covered with visceral fat from a biohazard waste container at the autopsy. Plaintiffs contend that England also took at least a piece of an organ; England denies this. (Plaintiffs' evidence on this point is not strong, but for the purposes of summary judgment, the court will assume that plaintiffs are right.) All agree that England was not authorized to take even the gauze and that she knew she was not authorized to do so.

In November and December 2011, England took her dog to two cadaver dog training sessions in Madison put on by Carren Cocoran, a Madison Police K-9 patrol handler. England brought some human material to the November session to serve as a training aid. The actual nature of this material is disputed: England contends that it contained only her daughter's placenta and visceral fat from Olejnik; plaintiffs contend that it contained an organ from Olejnik; and some participants at the session recall England describing it as an "organ." After class, the participants divided that material among themselves to take home and use to train their dogs.

On January 3, 2012, an Oneida County sheriff's deputy learned that England had removed materials from two autopsies conducted that day. The next day, England was arrested and charged with misconduct in office and with theft for her removal of material from those autopsies. England resigned her position as Oneida County Medical Examiner on January 17, 2012.

4

During the criminal investigation of England's conduct, Oneida County law enforcement retrieved the material that England had distributed at the November 2011 cadaver dog training session. State crime lab results detected Olejnik's DNA in the material.

England eventually pleaded to charges based on the materials taken from the January 2012 autopsies; charges based on England's taking of Olejnik's remains were read in for consideration at sentencing. The Oneida County Circuit Court sentenced England to three years of probation, community service, and one year of jail time imposed but withheld.

Plaintiffs filed suit in state court, asserting four federal constitutional claims pursuant to 42 U.S.C. § 1983 and four state law claims. Defendants removed to federal court. Dkt. 1. WCMIC, which issued a public entity liability insurance policy to Oneida County covering January 1, 2011, through January 1, 2012, intervened to seek a declaratory judgment that none of plaintiffs' claims against England would be covered under the county's policy. Dkt. 8.

The court has subject matter jurisdiction over plaintiffs' 42 U.S.C. § 1983 claims, pursuant to 28 U.S.C. § 1331, because they arise under federal law. The court would have supplemental jurisdiction over plaintiffs' remaining state law claims, pursuant to 28 U.S.C. § 1367(a), because those claims are so related to plaintiffs' section 1983 claims that they form part of the same case or controversy.

ANALYSIS

Plaintiffs' federal constitutional claims are brought under the auspices of 42 U.S.C. § 1983, which authorizes suits for damages against individual government officials who violate a plaintiff's rights under the United States Constitution or a federal statute. To prevail on their section 1983 claims, plaintiffs must demonstrate: (1) that England's wrongful

conduct was taken "under color of law," and (2) that England deprived plaintiffs of rights protected by federal law. *Windle v. City of Marion*, 321 F.3d 658, 661 (7th Cir. 2003).

Plaintiffs contend that England violated their constitutional rights in two ways: first, by ordering Olejnik's autopsy for illegitimate purposes, and second, by taking material from Olejnik's autopsy without authorization. Plaintiffs contend that England acted under color of law when she ordered the autopsy and when she attended the autopsy to collect specimens to use for cadaver dog training. Defendants move for summary judgment on both elements of plaintiffs' section 1983 claims.

The court must grant summary judgment when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To avoid summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* The non-moving party may not simply rely on the allegations in its pleadings to create a genuine dispute but must "demonstrate that the record, taken as a whole, could permit a rational finder of fact to rule in [its] favor[.]" *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996). "[S]ummary judgment 'is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.'" *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (quoting *Schacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)).

6

## A. Whether England acted under color of law

Section 1983 protects individuals against deprivations of federal rights at the hands of government officials. It does not provide a cause of action against purely private acts, thus the requirement that a section 1983 claim involve actions taken "under color of law." As the Supreme Court explained the concept in the seminal case of *Monroe v. Pape*, "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of state law.'" 365 U.S. 167, 184 (1961) (citation omitted). To take a prototypical example, a police officer who uses excessive force when making an arrest acts under color of law. The officer acts under color of law because in making the arrest, he is exercising the authority granted to him by the state, even if the excessive force is unauthorized, and indeed prohibited. But not every act by a government official is taken under color of law. If the same officer committed a battery during a bar fight that did not involve his official duties, he would not be acting under color of law. The victim of the battery might have a state law tort claim against the officer, but he would not have a viable section 1983 claim. *Cf. Bladdick v. Pour*, 833 F. Supp. 2d 1032, 1038 (S.D. Ill. 2011).

The under color of law inquiry is not amenable to simple formulations and bright-line rules. The question turns on the nature of the specific acts of the government official; it is not the subjective motive of the official that matters but the specific means by which the injuries are carried out. *Ector v. Powell*, No. IP-00-20-C-B/S, 2002 WL 356704, at *4 (S.D. Ind. Mar. 1, 2002); *see also Walker v. Taylorville Corr. Ctr.*, 129 F.3d 410, 413-14 (7th Cir. 1997) ("Whether or not she then took the alleged actions 'in pursuit of her own interests,' she was able to do so solely because of the position of authority she enjoyed."). Whether the official

was on-duty is not dispositive. The factors courts most commonly consider are whether the wrongful acts furthered an officer's official duties, or whether the officer invoked his authority or deployed indicia of his authority when committing the wrongful acts. *See Wilson v. Price*, 624 F.3d 389, 392 (7th Cir. 2010); *Honaker v. Smith*, 256 F.3d 477, 484-85 (7th Cir. 2001); *Latuszkin v. City of Chicago,* 250 F.3d 502, 505-06 (7th Cir. 2001). As the Supreme Court put it, "[i]t is clear that under 'color' of law means under 'pretense' of law. Thus acts of officers in the ambit of their personal pursuits are plainly excluded." *Screws v. United States*, 325 U.S. 91, 111 (1945). The under color of law inquiry is largely a question of fact, but it is amenable to summary judgment if, as here, the material facts are not disputed. *See Gibson v. City of Chicago*, 910 F.2d 1510, 1517 (7th Cir. 1990).

The court starts with the obvious: England acted under color of law when she ordered Olejnik's autopsy. Determining Olejnik's cause of death was England's responsibility as medical examiner, and she had the discretion to order his autopsy if she believed circumstances suggested death under "unexplained circumstances." There is simply no question that England was in fact acting as Oneida County Medical Examiner when she ordered the autopsy, which even defendants implicitly concede.

Whether England was acting under color of law when she took material from Olejnik's autopsy is a somewhat closer call. England was able to take the material because she was present for part of Olejnik's autopsy. Thus, plaintiffs argue, England's misappropriation was made possible by her official position, thus satisfying the under color of law element. But plaintiffs stretch the under color of law principle too far. All agree that England's duties as medical examiner had nothing to do with cadaver dogs or cadaver dog training. A medical examiner in Wisconsin is simply not responsible for finding dead bodies, by means of cadaver

dogs or otherwise. Acquiring human specimens for cadaver dog training was not part of England's duties as medical examiner; it was a purely private act. In this respect, England's actions were like those of the alderman in *Wilson v. Price*, who, while investigating constituent complaints about parking near an auto repair shop, assaulted an employee of the shop who refused to assist in moving the offending cars. 624 F.3d at 391. The court held that the alderman might have been acting under color of law in investigating the parking complaints, but he crossed the line into private action when he took it upon himself to enforce parking regulations. The enforcement of parking regulations was not related to the alderman's legislative duties, and thus the assault did not qualify as action taken under color of law. *Id.* at 393. So it is here: England crossed the line to purely private action when she took material from Olejnik's autopsy.

Turning now to the second factor: an action may be taken under color of law if the officer has cloaked himself in the authority of his office, even if the action itself is unauthorized. *See, e.g.*, *Pickrel v. City of Springfield*, 45 F.3d 1115, 1118 (7th Cir. 1995) (whether an off-duty officer was acting under color of law depended on display of indicia of authority, such as badge, uniform, and gun). Here, nothing in the record suggests that England invoked her authority as medical examiner to acquire the Olejnik material. Based on the record before the court, she simply took it. Dr. Kelley, the Fond du Lac County pathologist, was in charge of the Olejnik autopsy, and he conducted it without taking advice from England. The record suggests that Dr. Kelley knew that England was interested in cadaver dog training, but he understood that any use of human remains for that purpose would have to be with the permission of the family of the deceased. He did not remember England asking him for any specimens; if she had asked, he would not have agreed. Plaintiffs

have adduced no evidence whatsoever that England used any pretense of authority to acquire the Olejnik material. She took advantage of an opportunity that was available to her while she was on duty, but she did so for entirely private reasons without invoking, displaying, or pretending to have any authority as the medical examiner.

The court concludes that England acted under color of law when she ordered the Olejnik autopsy, but she did not act under color of law when she misappropriated material from the autopsy. Thus, plaintiffs do not have a viable section 1983 claim based solely on England's misappropriation of material from the autopsy. However, the court will proceed to the next step in the analysis, which requires to the court to determine whether England's actions violated plaintiffs' federal rights. As we will see, even if England had acted under color of law at all relevant times, she did not violate plaintiffs' federal rights.

## B.  Whether England violated plaintiffs' constitutional rights

Plaintiffs' amended complaint alleges multiple constitutional violations. But in response to defendants' motions for summary judgment, plaintiffs have pared their case down to their core allegations: that ordering David Olejnik's autopsy and removing portions of Olejnik's body for personal use violated plaintiffs' procedural and substantive due process rights.[1]

---

[1] Although plaintiffs' amended complaint alleges a "liberty" violation separate from the alleged due process violations, plaintiffs do not offer any arguments concerning a liberty violation as a stand-alone claim. Plaintiffs assert a liberty violation only in connection with their substantive due process claim.

Plaintiffs' amended complaint also alleges that England deprived plaintiffs of property without just compensation, in violation of the Fifth and Fourteenth Amendments. Dkt. 22, at 13. It is difficult to conceive of a Fifth Amendment takings claim entirely separate from plaintiffs' procedural due process claim, and the parties conflate the claims in their summary judgment briefing. The court concludes that plaintiffs have abandoned any Fifth Amendment takings claim by failing to develop an argument for it. In any case, the Fifth Amendment

### 1. Procedural due process

The Due Process Clause of the Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law[.]" U.S. Const. Amend. XIV, § 1. To prevail on a section 1983 procedural due process claim, plaintiffs must demonstrate that they: (1) have a cognizable property interest; (2) have suffered a deprivation of that interest; and (3) were denied due process. *Khan v. Bland*, 630 F.3d 519, 527 (7th Cir. 2010).

### a. Property interest

"Although the Fourteenth Amendment protects property rights, it does not create them. Instead, property rights 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'" *Frey Corp. v. City of Peoria*, 735 F.3d 505, 509-10 (7th Cir. 2013) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). Determining whether plaintiffs have identified a cognizable property interest is a two-step process. First, the court looks to state law (or some other independent source) to identify the asserted interest, and second, the court determines whether that interest rises to the level of a constitutionally protected property interest. *Swartz v. Scruton*, 964 F.2d 607, 609 (7th Cir. 1992). The second step is a question of federal law. *Id*. ("[F]ederal constitutional law determines whether such interests rise to the level of a constitutionally protected property right.").

---

would be a poor fit for plaintiffs' allegations, as the underlying facts do not demonstrate a taking of property for public use without sufficient monetary compensation.

In this case, plaintiffs contend that Wisconsin state law creates a constitutionally protected property interest in disposing of a loved one's remains without mutilation. Plaintiffs identify two state law sources for their alleged property interest: Wis. Stat. § 154.30(2)(a) and *Scarpaci v. Milwaukee County*, 96 Wis. 2d 663, 292 N.W.2d 816 (1980). Wis. Stat. § 154.30(2)(a) establishes an order of priority among those with the right to dispose of a decedent's remains. In this case, Olejnik's surviving parents, plaintiffs Walter and Katherine Olejnik, had the right to control final disposition of his remains. Olejnik's surviving siblings, plaintiffs Kenneth Olejnik and Joanne Olejnik, would have been next in line. In *Scarpaci*, the Wisconsin Supreme Court held that the family's right to dispose of a decedent's remains is an actionable right with a remedy:

> The law is clear in this state that the family of the deceased has a legally recognized right to entomb the remains of the deceased family member in their integrity and without mutilation. Thus the next of kin have a claim against one who wrongfully mutilates or otherwise disturbs the corpse.

*Scarpaci*, 292 N.W.2d at 820. Thus, under Wisconsin law, plaintiffs have *some* legally recognized interest in Olejnik's remains.

But not every state law interest rises to the level of a constitutionally protected property right under federal law. An interest is constitutionally protected as property only when an individual has a "legitimate claim of entitlement" to the interest. *Roth*, 408 U.S. at 577. As the Seventh Circuit has explained, an individual has a constitutionally protected property interest in "what is securely and durably yours under state . . . law, as distinct from what you hold subject to so many conditions as to make your interest meager, transitory, or uncertain[.]" *Reed v. Village of Shorewood*, 704 F.2d 943, 948 (7th Cir. 1983). A protected property interest must be sufficiently secure and, typically, not subject to discretionary state

action. *Cf. Barrows v. Wiley*, 478 F.3d 776, 780 (7th Cir. 2007) ("People have a legitimate claim of entitlement to keep that which presently securely belongs to them. Where state law gives people a benefit and creates a system of nondiscretionary rules governing revocation or renewal of that benefit, the recipients have a secure and durable property right, a legitimate claim of entitlement." (quoting *Cornelius v. LaCroix*, 838 F.2d 207, 210 (7th Cir. 1988)).

Under Wisconsin law, a family's interest in the remains of its deceased loved ones is simply too contingent to constitute a protected property interest. Wis. Stat. § 154.30(3)(a)2 provides that the next-of-kin's right to control final disposition of a loved one's remains is subject to the medical examiner's powers and duties "with respect to the reporting of certain deaths, performance of autopsies, and inquests under ch. 979." Under Chapter 979, a medical examiner is authorized to "take for analysis any and all specimens, body fluids and any other material which will assist him or her in determining the cause of death." Wis. Stat. § 979.01(3). And, most importantly, Wis. Stat. §§ 979.02 and 979.04 provide that a medical examiner may, in her discretion, order an autopsy for purposes of determining how an individual died if she has reason to believe that death "may have been due to suicide or unexplained or suspicious circumstances." Whether the requisite circumstances exist is based exclusively on the *subjective* determination of the medical examiner. *Scarpaci*, 292 N.W.2d at 826. A Wisconsin medical examiner's discretion to order autopsies and to retain specimens may not be boundless, but it is extremely broad. Accordingly, a family's right to dispose of the remains of its deceased loved ones is not "securely and durably" theirs, and thus it does not rise to the level of a constitutionally protected property interest. The court's conclusion is buttressed by the Wisconsin Supreme Court's holding that the family's right to the remains

13

of its decedents is not a property right but a "personal right of the family of the deceased to bury the body." *Id.* at 820-21.

Because plaintiffs' right to Olejnik's body does not rise to the level of a constitutionally protected property interest, they do not have a viable procedural due process claim, no matter how egregious or otherwise illegal England's interference with their interest. Because the underlying interest is not constitutionally protected, the court would not have to consider whether England's actions—either in ordering the autopsy or in removing portions of Olejnik's remains for personal use—constitute a deprivation of that interest without due process. *See Kim Const. Co. v. Bd. of Trs. of Vill. of Mundelein*, 14 F.3d 1243, 1245 (7th Cir. 1994) ("Unless [plaintiff] can establish as a matter of federal constitutional law that its claim is based on a protected property interest, the issue of whether it was afforded due process before being deprived of that interest does not arise."). Nevertheless, the court proceeds to the next step of the analysis, which provides another basis to grant summary judgment to defendants.

### b.  Deprivation of property interest

Even if the court were to assume, for purposes of summary judgment, that Wisconsin state law does create a sufficiently secure—and thus constitutionally protected—entitlement to bury a loved one's remains free from mutilation, plaintiffs cannot demonstrate that England deprived plaintiffs of that entitlement when she ordered Olejnik's autopsy.

An authorized autopsy does not constitute "mutilation" or interference with a loved one's remains because it is not an "improper act." *Scarpaci*, 292 N.W.2d at 820-21 ("The law is not primarily concerned with the extent of physical injury to the bodily remains but with whether there were any improper actions[.]"). *Scarpaci* does not stand for the principle that

14

an autopsy, when authorized and conducted properly, constitutes mutilation or otherwise impinges on an individual's right to bury a loved one with integrity and without mutilation. As explained above, the state-created interest does not protect against all interference with a loved one's remains: it protects only against unwarranted mutilation and is subordinate to a medical examiner's authority to order an autopsy.

Wisconsin Statutes Chapter 979 governs and regulates a medical examiner's decision to order autopsies. As discussed above, a medical examiner may, in her discretion, order an autopsy for purposes of determining how an individual died if she has reason to believe that death "may have been due to suicide or unexplained or suspicious circumstances." Wis. Stat. §§ 979.02, .04. England has testified, both via sworn affidavit and during her deposition, that she ordered Olejnik's autopsy because she believed that she was required to investigate his death because it occurred under "unexplained, unusual or suspicious circumstances." Dkt. 87, ¶ 9. England testified that Olejnik was a fairly young man when he passed (38 years old), which, in her opinion, made his death suspect. Dkt. 70 (England Dep. 89:24-90:24). Accordingly, England did not exceed her authority under Wisconsin law:

> [A] medical examiner acts outside his jurisdiction when he orders or conducts an autopsy either without having made a subjective determination that there is any reason to believe that any of the statutory circumstances justifying an autopsy exists or having made a subjective determination that there is no reason to believe that any of the statutory circumstances justifying an autopsy exists.

*Scarpaci*, 292 N.W.2d at 831. England has offered evidence that in her subjective opinion, Olejnik died for unexplained, possibly suspicious reasons. Plaintiffs allege that that England may have had other, unsavory reasons for ordering the autopsy, namely, to retrieve portions of the corpse for her personal use. But plaintiffs have not adduced any *evidence* to rebut

15

England's testimony. There is no evidence that Olejnik died under anything other than unexplained or suspicious circumstances, or that England acted outside of her authority when she ordered the autopsy. England's testimony stands uncontroverted, and no reasonable jury could find that England acted outside of her statutory authority when she ordered Olejnik's autopsy. Accordingly, defendants are entitled to summary judgment that England did not violate their procedural due process rights by ordering Olejnik's autopsy.

England's taking of material from the Olejnik autopsy, however, presents a different question because that action was not authorized under Wisconsin law. To address England's removal of Olejnik's bodily material, the court turns to the final step of the procedural due process analysis, which considers whether plaintiffs were denied any process to which they were due.

### c.  Due process

Plaintiffs have not identified the process that they were denied. "In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law.*" *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (emphasis in original). Accordingly, "to determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate." *Id.* at 126.

Plaintiffs overlook this element, presumably because they were not afforded any meaningful process *before* England took the material from Olejnik's autopsy. But in some cases, post-deprivation remedies are sufficient to safeguard an individual's due process rights. This is such a case.

16

When a deprivation is random and unauthorized, post-deprivation tort remedies are often sufficient to address the resulting loss. *Id.* at 132 ("[I]n situations where a predeprivation hearing is unduly burdensome in proportion to the liberty interest at stake, or where the State is truly unable to anticipate and prevent a random deprivation of a liberty interest, postdeprivation remedies might satisfy due process." (internal citations omitted)). The Seventh Circuit has recently clarified that this principle applies when: (1) the deprivation is unforeseeable and "cannot practicably be preceded by a hearing"; (2) the deprivation is not "enabled by a state's broad delegation of power"; and (3) the deprivation does not result from an official's "subversion of established state procedures." *Armstrong v. Daily*, 786 F.3d 529, 543 (7th Cir. 2015).

Even if England had acted outside of her statutory authority when she ordered Olejnik's autopsy, then England's actions would have been random and unauthorized: impossible to predict or preempt, not a proper exercise of her state-delegated power, and not facilitated by established state procedures. Under these circumstances, post-deprivation tort remedies would afford plaintiffs sufficient process. *See Belcher v. Norton*, 497 F.3d 742, 751 (7th Cir. 2007), *as amended*, (Nov. 19, 2007) (determining that because the defendant's actions did not comport with applicable statutory procedure, his actions were "random and unauthorized"). Similarly, plaintiffs have not identified, nor is the court able to conceive of, any pre-deprivation procedures that the state could have provided before England took portions of Olejnik's remains for her personal use. England's taking of material from the Olejnik autopsy is the epitome of unpredictable random and unauthorized conduct that a government can neither predict nor prevent with pre-deprivation process. Because post-

deprivation tort remedies exist under Wisconsin state law, as shown in *Scarpaci*, plaintiffs received the process to which they were due, albeit after the fact.

Plaintiffs' procedural due process argument relies heavily on a Sixth Circuit case, *Brotherton v. Cleveland*, 923 F.2d 477 (6th Cir. 1991). But that non-binding case is readily distinguishable because it involves an express government policy, not a random or unauthorized deprivation. In *Brotherton*, a coroner authorized removal of a decedent's corneas during autopsy to be used as anatomical gifts, pursuant to an Ohio state statute; however, the removal violated the decedent's widow's wishes. 923 F.2d at 478. The decedent's widow filed a section 1983 action, alleging that the city removed her husband's corneas without due process of law. *Id.* at 478-79. The *Brotherton* court determined that the plaintiff had a constitutionally protected property interest in her deceased husband's remains under Ohio law. *Id.* at 482. From here, the Sixth Circuit determined that Ohio failed to provide the necessary pre-deprivation process prior to removing the decedent's corneas because removal was pursuant to state statute: "deprivation of property *resulting from an established state procedure* can only satisfy due process if there is a predeprivation hearing." *Id.* (emphasis added).

The removal of the corneas in *Brotherton* was pursuant to an Ohio state statute; that action was poles apart from England's unauthorized taking. Accordingly, in this case, post-deprivation tort remedies adequately protect plaintiffs' due process interests. Defendants are entitled to summary judgment on plaintiffs' procedural due process claim.

### 2. **Substantive due process**

Plaintiffs also contend that England violated their substantive due process right to "non-interference with their remembrance of David." Dkt. 94, at 18.

The substantive due process doctrine is rooted in the notion that some rights and liberty interests are so fundamental that no amount of process would justify government interference. *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998); *Daniels v. Williams*, 474 U.S. 327, 331 (1986) ("[B]y barring certain government actions regardless of the fairness of the procedures used to implement them, it serves to prevent governmental power from being used for purposes of oppression." (internal citations and quotation marks omitted)). The substantive due process doctrine also protects non-fundamental liberty interests from arbitrary, unjustified government action. *Belcher*, 497 F.3d at 753. Plaintiffs' argument in support of their substantive due process claim appears to invoke both concepts.

A right is sufficiently fundamental to warrant substantive due process protection when it is very deeply rooted in our history and legal traditions, and it is "'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'" *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (citing *Palko v. Connecticut*, 302 U.S. 319, 325 (1937)). Government interference with a liberty interest violates substantive due process if the interference is so arbitrary and irrational that, when the court considers all circumstances, it "shocks the conscience." *Lee v. City of Chicago*, 330 F.3d 456, 467 (7th Cir. 2003). This is a relatively tough standard to meet; the doctrine of substantive due process is not a magic formula that turns every grievance into a constitutional violation. *See generally Gen. Auto Serv. Station v. City of Chicago*, 526 F.3d 991, 1000 (7th Cir. 2008); *Lee*, 330 F.3d at 467 (substantive due process "is not a blanket protection against unjustifiable interferences with property").

Respectful treatment of the dead is certainly a deeply rooted tradition in our culture, as in others. And we accord the family a measure of privacy and autonomy in disposing of

19

their loved ones' remains. But it would be quite a stretch to say that a family's right to the remains of its deceased loved ones is implicit in the concept of ordered liberty. If that right were so fundamental, then Wisconsin would not make it so easy for medical examiners to order autopsies and to retain specimens.

Plaintiffs base their substantive due process argument nearly entirely on a Ninth Circuit case, *Marsh v. County of San Diego*, 680 F.3d 1148 (9th Cir. 2012). In *Marsh*, family members filed a section 1983 action objecting to publication of photos of their son's autopsy and death scene. 680 F.3d at 1153. The Ninth Circuit, regarding the case as a matter of first impression, held that the common law right to non-interference with a family's remembrance of a decedent is so ingrained in our traditions that it is constitutionally protected. *Id.* at 1154. The Ninth Circuit started by recognizing that family members have a well-established common law privacy right to protect a loved one's death images from publication. *Id.* at 1153. The Ninth Circuit held that the common law right was so ingrained that it rose to the level of a constitutional right:

> The long-standing tradition of respecting family members' privacy in death images partakes of both types of privacy interests protected by the Fourteenth Amendment. . . . Few things are more personal than the graphic details of a close family member's tragic death. Images of the body usually reveal a great deal about the manner of death and the decedent's suffering during his final moments—all matters of private grief not generally shared with the world at large.

*Id.* at 1154. This court will not follow *Marsh* for two reasons.

First, the plaintiffs' privacy claim in *Marsh* is different from plaintiffs' claims here. *Marsh* dealt specifically with the publication of death scene images that directly implicated the plaintiffs'—the surviving family members'—privacy interests. *Marsh* considered the family members' "personal stake in honoring and mourning their dead and objecting to unwarranted

public exploitation[.]" *Id*. at 1153. The Ninth Circuit emphasized the right to be free from the "outrageous display" of a loved one's death in public. *Id. Marsh* considered the quasi-sacred place that death images have in our society. But England made no public disclosure or display of Olejnik's death or autopsy. Even when she shared the bodily materials at the dog-training class, plaintiffs do not allege that she said anything about Olejnik. Plaintiffs' privacy interests are not implicated in this case.

Second, and more importantly, the *Marsh* holding represents an expansion in substantive due process law not augured in Seventh Circuit precedent. The Supreme Court has held that substantive due process protects the freedoms specifically enumerated in the Bill of Rights in addition to several non-enumerated rights, including the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion. *Glucksberg*, 521 U.S. at 720 (citing cases). But the Supreme Court has been reluctant to enlarge the list of rights protected by substantive due process "because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Id*. The Seventh Circuit has not recognized any constitutionally protected interest in the "right to remembrance" or to the non-interference with a loved one's remains. Rather, the Seventh Circuit has recognized that the Supreme Court has emphasized how limited the scope of substantive due process is, and that substantive due process is "a modest limitation that prohibits government action only when it is random and irrational." *Gen. Auto Serv. Station*, 526 F.3d at 1000.

Wisconsin law protects the family's right to remember a loved one and to bury that loved one in peace and privacy. The Wisconsin Supreme Court once articulated this right in emphatic terms:

21

> We can imagine no clearer or dearer right in the gamut of civil liberty and security than to bury our dead in peace and unobstructed; none more sacred to the individual, nor more important of preservation and protection from the point of view of public welfare and decency; certainly none where the law need less hesitate to impose upon a willful violator responsibility for the uttermost consequences of his act.

*Koerber v. Patek*, 123 Wis. 453, 102 N.W. 40, 43 (1905). The court's rhetoric is plainly hyperbolic, because in the next sentence the court "recognize[d], of course, that public welfare may and does require governmental control in many respects for protection of life and health of the people, and for discovery of crime connected with the death of a person, and to such interests the private right is subservient so far as necessary." *Id*.

Plaintiffs had a right, recognized under Wisconsin law, to control the disposition of Olejnik's body, subject to the broad authority granted to medical examiners and other state authorities. But this common law right is not one "implicit in the concept of ordered liberty" such that "neither liberty nor justice would exist if [it] were sacrificed." *Glucksberg*, 521 U.S. at 721 (citations omitted). Accordingly, the court concludes that plaintiffs cannot maintain their substantive due process claim as a matter of law, because they do not have a substantive due process right to non-interference with the remembrance of their decedent.[2]

---

[2] Any attempt by plaintiffs to assert a substantive due process claim on the basis of a property interest would also fail. "[W]hen a substantive-due-process challenge involves only the deprivation of a property interest, a plaintiff must show either the inadequacy of state law remedies or an independent constitutional violation[.]" *Lee*, 330 F.3d at 467; *see also Veterans Legal Def. Fund v. Schwartz*, 330 F.3d 937, 941 (7th Cir. 2003) ("When a plaintiff brings a substantive due process claim predicated on the deprivation of a state-created property interest, she must show that the state violated some other substantive constitutional right or that state law remedies are inadequate."). For reasons already discussed, plaintiffs have not shown that Wisconsin's post-deprivation tort law remedies are inadequate to compensate plaintiffs for England's actions, and plaintiffs have not identified an independent constitutional violation.

As a final note, even if the court were to determine that plaintiffs enjoy a constitutionally protected liberty interest in burying Olejnik's remains, and assuming that England violated that right, the right was not clearly established at the time of England's alleged violations. "[Q]ualified immunity protects government agents from liability when their actions do not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Hernandez v. Cook Cty. Sheriff's Office*, 634 F.3d 906, 914 (7th Cir. 2011) (citations and internal quotation marks omitted). *Marsh* was not decided until May 29, 2012, approximately one year after Olejnik's autopsy and six months after England allegedly brought his remains to cadaver dog training class. The *Marsh* court recognized that "[s]o far as we are aware, then, this is the first case to consider whether the common law right to non-interference with a family's remembrance of a decedent is so ingrained in our traditions that it is constitutionally protected." *Marsh*, 680 F.3d at 1154. The *Marsh* court specifically recognized that the *federally* protected rights were not clear "prior to today." *Id.* at 1159. Because the federal rights asserted by plaintiffs were not clearly established at the time of the alleged violation, England would be entitled to qualified immunity against plaintiffs' federal claims.

Plaintiffs are not utterly without remedy, but that remedy lies exclusively with the State of Wisconsin.

## C.  State law claims

The court declines to exercise supplemental jurisdiction over plaintiffs' remaining state law claims. Under 28 U.S.C. § 1367(c)(3), district courts may decline to exercise supplemental jurisdiction over a claim if "the district court has dismissed all claims over which it has original jurisdiction." District courts exercise their discretion when determining

whether to exercise supplemental jurisdiction. *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 172 (1997) ("[P]endent jurisdiction is a doctrine of discretion, not of plaintiff's right[.]"). Because this case now involves only matters of Wisconsin law, it is appropriate for it to be heard by the state court in which it originated, Oneida County Circuit Court. The court remands plaintiffs' state law claims to Oneida County for resolution.


ORDER

IT IS ORDERED that:

1. Defendant Traci J. England's motion for summary judgment, Dkt. 76, is GRANTED.

2. Defendant Oneida County's motion for summary judgment, Dkt. 82, is GRANTED.

3. Intervenor Defendant Wisconsin County Mutual Insurance Corporation's motion for summary judgment, Dkt. 71, is DENIED as moot.

4. Plaintiffs' federal claims are DISMISSED with prejudice.

5. Plaintiffs' remaining state law claims are REMANDED to Oneida County Circuit Court. The clerk of court is directed to return the record of this case to the state.

6. The clerk of court is further directed to enter judgment for defendants on plaintiffs' claims under 42 U.S.C. § 1983 and close this case.

Entered November 25, 2015.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge

24